1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   WILLIAM OLSON, et al.,                     CASE NO. C20-0429JLR

11                           Plaintiffs,        ORDER

12          v.

13   ARMADA CORPORATION,

14                           Defendant.

15                    **I.      INTRODUCTION**

16          Before the court are:  (1) Defendant Armada Corporation's ("Armada") motion for

17   summary judgment (Def. MSJ (Dkt. # 26)); and (2) Plaintiffs William Olson and Crystal

18   Olson's (collectively, "the Olsons") cross-motion for partial summary judgment and

19   request for judicial notice (Pls. MSJ (Dkt. # 38)).  Each opposes the other's motion.  (*See*

20   Pls. MSJ Resp. (Dkt. # 35); Def. MSJ Resp. (Dkt. # 45).)  The court has considered the

21   motions, the parties' submissions in support of and in opposition to the motions, the

22   //

ORDER - 1

1  relevant portions of the record, and the applicable law.  Being fully advised,[1] the court

2  GRANTS Armada's motion and DENIES the Olsons' motion.

3                                    **II.      BACKGROUND**

4  **A.      Factual Background**

5           This case concerns a debt that originated when Mr. Olson borrowed money from

6  Red Canoe Credit Union ("Red Canoe") and subsequently failed to repay the loan.  (*See*

7  Def. MSJ at 1; Pls. MSJ at 2.)  Thereafter, Red Canoe assigned the debt to Armada.  (*See*

8  Def. MSJ at 1; Pls. MSJ at 2.)  The parties disagree about what happened next.

9           Armada contends that, as part of its ordinary collection process, it sent some

10  "initial correspondence," including a written collection notice, to Mr. Olson between June

11  and August 2016.  (*See* Def. MSJ at 1; Suppl. Gagne Decl. (Dkt. # 42) at 3.)  Mr. Olson

12  acknowledges that the address to which Armada claims these letters were sent was his

13  correct mailing address (Sturdevant Decl. (Dkt. # 37[2]) ¶ 12; *id.* at 133[3] (answering

14  Armada's interrogatory no. 1); *see also* Pls. MSJ Resp. at 4; Pls. MSJ at 4), but he

15  nevertheless denies that he received any communication from Armada during this time

16

17          [1] Neither party has requested oral argument (*see* Def. MSJ at 1; Pls. MSJ at 1), and the
court has determined that oral argument would not be helpful to its disposition of the motions,
18  *see* Local Rules W.D. Wash. LCR 7(b)(4).

19          [2] The Olsons filed identical copies of the declaration of James Sturdevant in response to
Armada's motion for summary judgment and in support of their motion for partial summary
20  judgment.  (*Compare id.* to 9/16/21 Sturdevant Decl. (Dkt. # 39).)  For simplicity, the court cites
only to the copy that the Olsons filed in support of their response to Armada's motion.

21          [3] To avoid confusion when referring to documents attached to Mr. Sturdevant's
declaration, the court cites to the declaration paragraph introducing the document when that
22  document is first mentioned and then also to the page number that appears on the document's
CM/ECF file stamp.

1   period (Sturdevant Decl. at 133; *see also* Pls. MSJ Resp. at 4; Pls. MSJ at 3, 7).  Indeed,

2   the Olsons contend that they did not speak to Armada or learn of the debts underlying this

3   dispute until "early 2019" when the debts appeared on a credit report that Mr. Olson

4   pulled in connection with their effort to purchase a home.  (Pls. MSJ at 9; Sturdevant

5   Decl. ¶ 15; *id.* at 151 ("Olson Decl.").)

6         After seeing the credit report, Mr. Olson contacted Armada by telephone on

7   February 7, 2019, which was, according to the Olsons, the first time the parties

8   communicated.  (Sturdevant Decl. at 135 (answering Armada's interrogatory no. 8); *see*

9   *also* Pls. MSJ Resp. at 2; Pls. MSJ at 13.)  The parties agree that during the February 7,

10  2019 call Mr. Olson spoke with Armada's agent Evangelina Saldana, and that they settled

11  on a monthly repayment plan, including an amount and method of repayment, that was

12  set to begin on February 20, 2019.  (*See* Pls. MSJ Resp. at 2; Def. MSJ at 1, 8; Gagne Tr.

13  Cert. (Dkt. # 29) at 2, Ex. 1 ("2/7/19 Call Tr.").)

14        The parties disagree, however, about the exact amount that Mr. Olson agreed to

15  repay each month, and how he was told to make his payments.  (*See* Pls. MSJ Resp. at 2;

16  Def. MSJ at 8.)  Mr. Olson says he agreed to pay $150 each month and that he was told to

17  make the payments online through Armada's website.  (*See* Pls. MSJ Resp. at 2;

18  Sturdevant Decl. at 137-138 (answering Armada's interrogatory no. 13).)  Armada says

19  the agreement was for monthly payments of $100 and that Mr. Olson was instructed to

20  //

21  //

22  //

ORDER - 3

1   send his payment by mail or over-the-phone by credit or debit card.  (*See* Def. MSJ at 8;

2   2/7/19 Call Tr. at 6-8.[4])

3          On February 20, 2019, Ms. Olson attempted to make the first payment through

4   Armada's website and found that she was only able to make payments for substantially

5   more than the amount for which their repayment plan called.  (*See* Sturdevant Decl. at

6   135-36 (answering Armada's interrogatory nos. 8-9); Gagne Tr. Cert. at 2, Ex. 2

7   ("2/20/19 Call Tr.") at 10.)[5]  Mr. Olson then contacted Armada by phone and, once again,

8   spoke with Ms. Saldana.  (*See* 2/20/19 Call Tr.; Sturdevant Decl. at 135-36 (answering

9   Armada's interrogatory no. 8).)  Mr. Olson and Ms. Saldana discussed the Olsons' efforts

10  to remit payment through Armada's website and their frustration at the website's inability

11  to accept the agreed upon amount.  (*See id.*)

12         The Olsons did not make a payment to Armada on February 20, 2019.  Instead,

13  they sent a letter to Armada shortly thereafter in which they requested that Armada verify

14  the debts but did not dispute the amount owed ("Verification Request").  (Sturdevant

15  Decl. ¶ 14; *id.* at 148-49 (Verification Request).)  The Olsons contend that Armada

16  received that letter on March 6, 2019 (Pls. MSJ at 4), although Armada says it did not

17  arrive until March 26, 2019 (Gagne Decl. (Dkt. # 28) at 2; Suppl. Gagne Decl. at 3, Ex. 1

18  ("Olson Account Records"); *id.* at 5 (indicating on lines 205-07 that a letter was received

19  on March 26, 2019)).  On March 18, 2019, Armada filed a lawsuit in Whatcom County

20

21         [4] Citations to the February 7, 2019 call transcript are to the page numbers in the CM/ECF
    file stamp.

22         [5] Citations to the February 20, 2019 call transcript are to the page numbers in the
    CM/ECF file stamp.

District Court and named as defendants "William T. Olson & Crystal Olson, husband & wife." (Gagne Decl. at 2; Frawley Decl. (Dkt. # 27) ¶ 1, Ex. 1 ("Whatcom County Am. Compl.").) Armada responded to the Verification Request on April 24, 2019. (Olson Account Records at 6 (showing on line 303 that a validation letter was sent on April 24, 2019; *see also* Pls. MSJ Resp. at 2, 5; Def. MSJ at 2.)

After the Olsons answered Armada's amended state court complaint (*see* Frawley Decl. ¶ 2, Ex. 2 ("Whatcom County Answer")), the parties stipulated to the dismissal of Ms. Olson's "separate estate" from the action. (*See* Gagne Decl. at 2, 4, Ex. 2). Subsequently, the parties agreed to settle the state court case altogether and jointly dismissed that action on October 14, 2019. (Frawley Decl. ¶ 3, Ex. 3.)

**B.   Procedural History**

The Olsons initiated this action with the filing of a complaint on March 20, 2020. (Compl. (Dkt. # 1).) Armada answered the complaint on June 12, 2020. (Answer (Dkt. # 11).) The Olsons filed an amended complaint on July 13, 2021 and allege that Armada violated their rights under: (1) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*; (2) the Washington Collection Agency Act ("WCAA"), ch. 19.16 RCW; and (3) the Washington Consumer Protection Act ("WCPA"), ch. 19.86 RCW. (Am. Compl. (Dkt. # 24) ¶¶ 23-41.)

On August 18, 2021, Armada moved for summary judgment on each of these claims. (*See* Def. MSJ at 7-11.) One month later, the Olsons moved for summary judgment on their FDCPA and WCPA claims and asked the court to take judicial notice of certain facts referenced in their briefing. (*See* Pls. MSJ at 2-3, 5.)

1

## III.   ANALYSIS

2        Below, the court reviews the parties' cross-motions for summary judgment.

3   Armada seeks summary judgment on all claims brought against it, arguing that the

4   Olsons (1) should have raised them, if at all, as compulsory counterclaims in the

5   Whatcom County District Court litigation (Def. MSJ at 5-6); and (2) even if they are

6   properly before the court, they rely on misstatements of fact and are unsupported by the

7   law (*id.* at 7-11).  In response, the Olsons primarily attempt to articulate questions of fact

8   sufficient to defeat Armada's motion (*see* Pls. MSJ Resp. at 1-3, 6, 8, 11-12), but also

9   argue in their cross-motion that, "as a matter of law, on undisputed facts," they are

10  entitled to summary judgment on their FDCPA and WCPA claims (Pls. MSJ at 3).

11       The court begins by briefly reviewing the relevant legal standard for cross-motions

12  for summary judgment.  It then turns to consider Armada's argument that the Olsons'

13  claims are barred as compulsory counterclaims, which should have been brought in the

14  state court action.  Finding that they are not barred, the court reviews the merits of the

15  Olsons' claims under the FDCPA, WCAA, and WCPA and GRANTS summary

16  judgment to Armada on each claim.

17  **A.    Summary Judgment Standard**

18       Summary judgment is appropriate if the evidence, when viewed in the light most

19  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

20  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

21  P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.,*

22  477 F.3d 652, 658 (9th Cir.2007).  A dispute is "genuine" "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a fact is "material" if "might affect the outcome of the suit under the governing law," *id.* "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

If the moving party bears the ultimate burden of persuasion at trial, it must establish a *prima facie* showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could

//

1   reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477

2   U.S. at 250.

3        Where cross motions are at issue, the court must "evaluate each motion separately,

4   giving the nonmoving party in each instance the benefit of all reasonable inferences."

5   *ACLU of Nev. v. City of Las Vegas,* 466 F.3d 784, 790-91 (9th Cir. 2006) (citations

6   omitted); *see also Burrows v. 3M Co.*, No. C19-1649RSL, 2021 WL 1171999, at *2

7   (W.D. Wash. Mar. 29, 2021).

8   **B.   The Parties' Cross-Motions**

9        Having reviewed the relevant standard on summary judgment, the court now turns

10  to consider each of the arguments made by the parties in their cross-motions briefing.

11       1.   Compulsory Counterclaims

12       Armada argues that the Olsons' claims "clearly arose out of the same transaction"

13  at issue in the state court litigation and thus should have been raised as compulsory

14  counterclaims in state court.  (Def. MSJ at 6 (arguing that the "application of traditional

15  res judicata principals [sic]" bars their claims).)  The Olsons deny that their claims should

16  have been brought in state court and argue that the issue there was "offer, acceptance and

17  consideration for a debt," whereas the question before the court is "whether the debt

18  collector followed the rules in collecting the debt."  (Pls. MSJ Resp. at 11.)  The Olsons

19  are correct.

20       "[Washington] law governs the question whether [the Olsons'] FDCPA claims are

21  barred by claim preclusion."  *Cutts v. Richland Holdings, Inc.*, 953 F.3d 554, 557 (9th

22  Cir. 2019) (certifying question of whether an FDCPA claim is a compulsory counterclaim

1    under Nevada law to the Nevada Supreme Court).  A counterclaim is compulsory if it

2    "arises out of the transaction or occurrence that is the subject matter of the opposing

3    party's claim and does not require for its adjudication the presence of third parties of

4    whom the court cannot acquire jurisdiction."  Wash. Super. Ct. Civ. R. 13.  In evaluating

5    whether two claims arise from the same "transaction or occurrence," courts ask "whether

6    the claim and counterclaim are logically related."  *Schoeman v. New York Life Ins. Co.*,

7    726 P.2d 1, 6 (Wash. 1986); *see also Mattel, Inc v. MGA Ent., Inc.*, 705 F.3d 1108, 1110

8    (9th Cir. 2013) (applying the "logical relationship test").  "The failure to assert a

9    compulsory counterclaim bars a later action on that claim" even if the initial action

10   occurred in a different jurisdiction.  *See Schoeman*, 726 P.2d at 5.

11          Seemingly every court to consider this issue has held that claims brought pursuant

12   to consumer protection statutes, including the FDCPA, arise from a different transaction

13   or occurrence than an earlier action for judgment on a debt and, therefore, may be raised

14   in a separate action.  *See, e.g.*, *Sprinkle v. SB&C Ltd.*, 472 F. Supp. 2d 1235, 1242 (W.D.

15   Wash. 2006) (allowing an FDCPA claim to proceed because "[t]he present lawsuit

16   challenges debt collection practices that *led* to the judgment, not the judgment itself");

17   *Druther v. Hamilton*, No. C09-5503 FDB, 2009 WL 4667376, at *5 (W.D. Wash. Dec. 3,

18   2009).  The reasoning is straightforward:  "the evidence needed to support each claim

19   differs."  *Sparrow v. Mazda Am. Credit*, 385 F. Supp. 2d 1063, 1068-69 (E.D. Cal. 2005).

20   For a consumer protection claim, "[t]he plaintiff needs to produce evidence of the

21   allegedly abusive collection practices, including evidence regarding the specific actions

22   of the defendant, such as phone calls and letters, on certain dates and times; whereas the

1    defendant needs to produce evidence of the existence of a valid contract and breach [to

2    prevail on a debt collection action]." *Id.*

3        Because the Olsons challenge only the debt collection practices of Armada "that

4    *led* to the judgment," but do not challenge or dispute the underlying "judgment itself,"

5    their claims are not compulsory counterclaims and are not barred by res judicata

6    principles. *See Sprinkle*, 472 F. Supp. 2d at 1242 (emphasis in original); *see also Wilson

7    v. Discover Bank*, Case No. C12-5209RBL, 2012 WL 1899539, at *2 (W.D. Wash. May

8    24, 2012) (noting that the FDCPA does not "require proof that the underlying debt is

9    valid"). Accordingly, their claims are properly before the court and may be reviewed on

10   the merits.

11       2.    Fair Debt Collection Practices Act Claims

12       The FDCPA, 15 U.S.C. § 1692 *et seq.*, "regulates the actions debt collectors can

13   take when attempting to collect consumer debt." *Cutts v. Richland Holdings, Inc.*, 953

14   F.3d 554, 556 (9th Cir. 2019). It was enacted "to eliminate abusive debt collection

15   practices by debt collectors, to insure that those debt collectors who refrain from using

16   abusive debt collection practices are not competitively disadvantaged, and to promote

17   consistent State action to protect consumers against debt collection abuses." 15 U.S.C.

18   § 1692(e). It prohibits the use of, as relevant to this litigation, "false, deceptive, or

19   misleading misrepresentation or means in connection with the collection of any debt,"

20   such as "threat[s] to take any action that cannot legally be taken or that is not intended to

21   be taken," or "false representation or deceptive means to collect or attempt to collect any

22   debt or to obtain information concerning a consumer," *id.* § 1692e, (5), (10). It also

1    prohibits the use of "unfair or unconscionable means to collect or attempt to collect and

2    debt." *Id.* § 1692f.

3         Finally, the FDCPA imposes certain notice obligations on debt collectors,

4    including, that they must send the consumer a written notice within five (5) days after the

5    "initial communication" that contains:

6         (1) the amount of the debt;

7         (2) the name of the creditor to whom the debt is owed;

8         (3) a statement that unless the consumer, within thirty days after receipt of
     the notice, disputes the validity of the debt, or any portion thereof, the debt
9    will be assumed to be valid by the debt collector;

10        (4) a statement that if the consumer notifies the debt collector in writing
     within the thirty-day period that the debt, or any portion thereof, is
11   disputed, the debt collector will obtain verification of the debt or a copy of
     a judgment against the consumer and a copy of such verification or
12   judgment will be mailed to the consumer by the debt collector; and

13        (5) a statement that, upon the consumer's written request within the thirty-
     day period, the debt collector will provide the consumer with the name and
14   address of the original creditor, if different from the current creditor.

15   *Id.* § 1692g(a).  If this information was relayed in the initial communication, or if the debt

16   has already been paid, no notice is required.  *Id.*  Where the consumer disputes the debt,

17   the debt collector is obligated "to cease collection of the debt . . . until the debt collector

18   obtains verification of the debt or a copy of a judgment, or the name and address of the

19   original creditor, and a copy . . . is mailed to the consumer."  *Id.* § 1692g(b).

20        To enforce these rights and obligations, the FDCPA "authorizes private lawsuits

21   and weighty fines designed to deter wayward collection practices."  *Henson v. Santander*

22   *Consumer USA Inc.*, 137 S. Ct. 1718, 1720 (2017).  To prevail, a plaintiff must show

1   that:  (1) it "has been the object of collection activity arising from a consumer debt, (2)

2   the defendant collecting the debt is a debt collector as defined in the [FDCPA], and (3)

3   the defendant has engaged in any act or omission in violation of the prohibitions of the

4   act." *Est. of Hoskins v. Wells Fargo Bank, N.A.*, No. C20-75RSM, 2020 WL 3884517, at

5   *8 (W.D. Wash. July 9, 2020) (quotation marks omitted).

6          The Olsons allege, in separate claims, that the FDCPA rights of both Mr. and Ms.

7   Olson were violated by Armada.  The court discusses each claim below, beginning with

8   Ms. Olson.

9                  *a.     Ms. Olson's FDCPA Claim*

10          Armada is alleged to have violated Ms. Olson's FDCPA rights "when it named

11  and sought judgment against [her] separate estate" in the state court lawsuit, which

12  amounted to a violation of the FDCPA's prohibition on using false or deceptive means to

13  collect a debt or threatening a collection action that cannot legally be taken.  (*See* Am.

14  Compl. ¶ 24 (alleging violations of 15 U.S.C. §§ 1692e(5), 1692e(10), and 1692f).)

15          Armada's argument is supported by the plain text of the state court filings, which

16  conclusively show that Armada did not sue any "separate estate" of Ms. Olson but,

17  rather, named Mr. and Ms. Olson as "husband and wife constituting [a] marital

18  community."  (*See* Whatcom County Am. Compl. at 1.)  In light of this evidence, the

19  burden shifts to the Olsons to identify specific facts from which a reasonable jury could

20  find in their favor.  *Celotex*, 477 U.S. at 324.  All that the Olsons can point to, however, is

21  the stipulated dismissal of Ms. Olson's "separate estate" from the state court lawsuit.

22  (Pls. MSJ Resp. at 2.)  Armada, however, never understood its complaint to encompass

1   Ms. Olson's "separate estate" (*see* Gagne Decl. at 2) and so the existence of that filing

2   hardly overcomes the clear language of the state court amended complaint (*see* Whatcom

3   County Am. Compl.).  Thus, looking to the plain language of the state court amended

4   complaint, the court finds that it did not include Ms. Olson's "separate estate."

5          That finding is fatal to the Olsons' claim because, under Washington law, "[a]ll

6   debt incurred by either spouse during marriage is presumptively community debt, a

7   general presumption only overcome by clear and convincing evidence to the contrary."

8   *United States v. Smith*, No. C14-5952RJB, 2016 WL 471171, at *3 (W.D. Wash. Feb. 8,

9   2016) (quoting *Oil Heat Co. v. D.D. Sweeney* 613 P.2d 169 (Wash. 1980)); RCW

10  26.16.200.  The Olsons make no argument that the debts owed to Armada did not qualify

11  as community property (*see generally* Pls. MSJ Resp.; Pls. MSJ) and admitted in state

12  court "that they are husband and wife and a marital community" (Whatcom County

13  Answer ¶ 1).  Accordingly, Armada was entitled to name Ms. Olson as a defendant in its

14  debt collection action and it did not violate the FDCPA by doing so.  *See Harper v.*

15  *Collection Bureau of Walla Walla, Inc.*, No. C06-1605JCC, 2007 WL 4287293, at *10

16  (W.D. Wash. Dec. 4, 2007) ("The FDCPA cannot be read to prohibit a debt collector

17  from naming the members of a marital community as joint defendants in a collection

18  action.").

19         Accordingly, the court GRANTS summary judgment in Armada's favor on Ms.

20  Olson's FDCPA claim.  *See id.* at *10 (noting that if the plaintiffs "felt the debts at issue

21  should not be considered a community obligation," they could have raised that argument

22  *//*

1    in the state court debt-collection action).  For the same reasons, the court also DENIES

2    the Olsons' request for summary judgment on this claim.

3                    b.    *Mr. Olson's 15 U.S.C. § 1692g Claim*

4          Mr. Olson charges that Armada violated his rights under 15 U.S.C. § 1692g by

5    failing to properly and timely validate the debts.  (Am. Compl. ¶¶ 28-29).  The critical

6    issue in addressing Mr. Olson's debt validation claims is identifying the "initial

7    communication" from which Armada's timing obligations sprung.  *See* 15 U.S.C.

8    § 1692g(a).  Armada contends that the "first communication" came through the letters it

9    sent to the Olsons on June 9, 2016, July 15, 2016, August 1, 2016, and August 31, 2016.

10   (*See* Olson Account Records at 1-2; Pls. MSJ Resp. at 5.)  The Olsons claim that they

11   never received those letters and insist that the February 7, 2019 phone call between Mr.

12   Olson and Ms. Saldana was "the first communication" between the parties.  (Pls. MSJ

13   Resp. at 7; Pls. MSJ at 3; *see also* Sturdevant Decl. at 133-135 (answering Armada's

14   interrogatories nos. 2-8).)

15         The significance of this factual dispute is clear.  If the February 7, 2019 call is

16   established as the "first communication," then "Armada had to send [Mr. Olson] the

17   1692g(a) notice within five days,"—that is, by on or about February 12, 2019—which it

18   indisputably did not do.  (*See* Suppl. Gagne Decl. at 2.)  On the other hand, if the June 9,

19   2016 letter was the "first communication," then Armada satisfied its verification

20   obligations on or around that same date because the notice Armada claims was mailed on

21   June 9, 2016 contained all of the information required by 15 U.S.C. § 1692g(a).  (*See*

22   Sturdevant Decl. ¶ 5; *id.* at 46 ("Notice 1" template); *see also* Olson Account Records at

1   1 (showing that the "Notice 1" template was sent on June 9, 2016).)  Moreover, because

2   the Olsons did not request verification of the debt until sometime after February 20, 2019

3   (*see* Pls. MSJ Resp. at 7; *see also* Verification Request), their "tardy request for

4   verification of the debt" would not have "trigger[ed] any obligation on the part of

5   [Armada] to verify the debt," *see Mahon v. Credit Bureau of Placer Cnty. Inc.*, 171 F.3d

6   1197, 1203 (9th Cir. 1999).  Thus, the issue of whether Armada's April 24, 2019

7   response to the Verification Request violated the FDCPA is moot.  *See id.*[6]

8          The Olsons principally try to create a triable issue of fact by arguing that "they

9   never received any written communication with Armada."  (Pls. MSJ Resp. at 7;

10  Sturdevant Decl. at 133-134 (answering Armada's interrogatory nos. 2 and 3); *cf.* Olson

11  Decl. ¶ 2 (stating Mr. Olson first became aware of the debts in 2019).)  Unfortunately for

12  the Olsons, the Ninth Circuit has made clear that "section 1692g(a) requires only that a

13  Notice be 'sent' by a debt collector.  A debt collector need not establish actual receipt by

14  the debtor." *Mahon v*, 171 F.3d at 1201-02; *see also LeClair v. Suttell & Assocs., P.S.*,

15  No. C09-1047JCC, 2010 WL 417418, at *4 (W.D. Wash. Jan. 29, 2010) ("[T]he Ninth

16  Circuit has interpreted the statute only to require evidence that the notice has been sent.").

17  Accordingly, summary judgment on this claim turns on whether Armada sent Notice 1 on

18  June 9, 2016, as it claims.  *See Mahon,* 171 F.3d at 1201–02.

19  //

20

21          ───────────────

22          [6] Because the Olsons did not dispute the debt, there can also be no claim that Armada
    failed to meet its obligations under 15 U.S.C. § 1692g(b).  (*See* Verification Request; *see also*
    Pls. MSJ at 4 (describing the Verification Request as a letter sent "under 1692g(a)).)

1   To prove that it did send Notice 1, Armada has produced declarations from the

2   manager of its Okanogan office, Cindy Gagne, who testifies that "Armada Corp.

3   delivered four letters to the residential address of Mr. and Mrs. Olson . . . by first class

4   mail, postage prepaid . . . none of which were returned by the US [sic] Post Office."

5   (Suppl. Gagne Decl. at 3.)  Ms. Gagne also provides "the electronic notes maintained by"

6   Armada in the normal course of business for the Olsons' account, which show that the

7   Notice 1 template was sent on June 9, 2016, and that three other letters were sent on July

8   15, 2016, August 1, 2016, and August 31, 2016.  (*See id.;* Olson Account Records at 1-2.)

9   Moreover, the Olsons do not deny that the address to which Armada claims to have sent

10  the four letters was a correct mailing address.  (*Compare* Sturdevant Decl. at 133

11  (identifying Mr. Olson's mailing address), *with* Olson Account Records at 1 (showing

12  Mr. Olson's correct mailing address).)

13  The Olsons attack this strong factual showing by arguing that Armada

14  cannot show that the four letters were, in fact, mailed to the Olsons because

15  Armada used a vendor to complete the mailing and so lacks the first-hand

16  knowledge required by Federal Rule of Evidence 602.  (*See* Pls. MSJ Resp. at 6-7;

17  Pls. MSJ at 3 (citing Fed. R. Evid. 602).)  But even the Olsons acknowledge that

18  Armada may "testify from personal knowledge that it filled in certain fields on a

19  computer which were supposed to be sent over a wire."  (Pls. MSJ at 3.)

20  Armada has done just that.  (*See* Suppl. Gagne Decl. at 3; Sturdevant Decl.

21  at 34-36 (Ms. Gagne's deposition transcript).)  Moreover, because Armada has

22  presented evidence that it caused Notice 1, and other letters, to be mailed in the

1    normal course of business, it gets the benefit of "the common law mailbox rule,"

2    which gives rise to a rebuttable presumption that the document was received by

3    the Olsons "shortly thereafter." *Mahon*, 171 F.3d at 1202.

4          The Olsons cannot rebut that presumption.  Indeed, they offer no evidence

5    to suggest that Armada's vendor did not "perform[] the[] mechanical procedure"

6    of printing and mailing letters transmitted to it by Armada.  (*See* Pls. MSJ Resp. at

7    6.)  And their effort to undermine the credibility of Armada's normal business

8    operation through vague comments about Armada's vendor[7] (*see* Pls. MSJ Resp.

9    at 5-7, 11-12) is unpersuasive.  *See Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946,

10   954 (9th Cir. 1978) (holding that "supposition, speculation, and conclusory

11   argument of counsel" does not suffice to create a genuine fact dispute).

12         Accordingly, the court GRANTS summary judgment to Armada on the Olsons'

13   claims under 15 U.S.C. § 1692g and, for the same reasons, DENIES the Olsons' motion.

14              *c.  Mr. Olson's 15 U.S.C. § 1692e Claim*

15         The gravamen of Mr. Olson's claim under 15 U.S.C. § 1692e is that Armada used

16   "false, deceptive, or misleading representation or means" to collect the debts when it

17   "reached the $150 a month payment agreement . . . payable at its website," even though

18

19         [7] The Olsons ask the court to take judicial notice of (1) search results for Armada's
     vendor, FocusOne LLC, on the Washington Secretary of State's website, (2) the home page of
20   Armada's website, and (3) certain information about the town of Linden, Michigan.  (Pls. MSJ
     Resp. at 13.)  They make no argument and cite no law in support of this request, and the records
21   themselves appear to be of questionable relevance to the issues before the court.  (*See id.*)  The
     court declines to take notice of these documents as they are "either inappropriate for judicial
22   notice under Federal Rule of Evidence 201 and/or irrelevant under Rule 401."  *See Taleff v. Sw.
     Airlines Co.*, 554 F. App'x 598, 599 n.1 (9th Cir. 2014).

1    the website could not process payment in that amount, and then sued the Olsons for the

2    unpaid debts (*see id.* ¶ 30 (citing 15 U.S.C. §§ 1692e(10))).  Armada argues that this claim

3    "is simply not factually support[ed]," as the Olsons were neither lied to nor misled.  (Def.

4    MSJ at 8.)  Rather, Armada asserts that an agreement was reached whereby Mr. Olson

5    would make monthly payments of $100 by mail, hand-delivery, or telephone.  (2/7/19

6    Call Tr. at 6-8.)  Armada further denies that Mr. Olson was "directed to make payment

7    through the Armada website."  (*Id.*)

8        Armada's argument is clearly supported by transcripts of the contemporaneous

9    calls, which were recorded by Armada in the normal course of its business (Gagne Tr.

10   Cert. at 2).  (*See generally* 2/7/19 Call Tr.; 2/20/19 Call Tr.)  Both transcripts show that

11   Mr. Olson agreed to make $100 payments on the 20th of each month, beginning on

12   February 20, 2019, and that Armada's representative advised him he could pay through

13   the mail or over the phone.  (*See* 2/7/19 Call Tr. at 3-5; 2/20/19 Call Tr. at 1-2.)  Neither

14   transcript supports the notion that Mr. Olson was told to make payments through

15   Armada's website.  (*See generally* 2/7/19 Call Tr.; 2/20/19 Call Tr.)

16       In response, the Olsons argue that the transcript lacks proper authentication, lacks

17   credibility, and is incomplete.  (Pls. MSJ Resp. at 10-11.)  Citing Federal Rules of

18   Evidence 901 and 1002, the Olsons claim the transcript lacks proper authentication,

19   although they do not move to strike these transcripts.  (*See id.*)  In any event, the court

20   finds that the transcripts are properly authenticated under Rule 901 because they are

21   introduced through the declaration of Cindy Gagne, who—after describing her role at

22   Armada and familiarity with its recording and transcription practices, as well as the steps

1   she took to transcribe the two calls with Mr. Olson—testifies that "the transcripts are

2   complete and accurate." (Gagne Tr. Cert. at 1-2); Fed. R. Evid. 901; *see Beyene v.*

3   *Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988) (excluding evidence from

4   the summary judgment record where the individual through whom the evidence was

5   introduced failed to lay any foundation in his declaration). And Rule 1002 does not apply

6   in this context, where Armada relies on an originally created writing—the transcripts—to

7   prove the "content of the conversations" with Mr. Olson, rather than the content of the

8   tape recording it created to further document the calls. *See United States v. Gonzales-*

9   *Benitez*, 537 F.2d 1051, 1053-54 (9th Cir. 1976); *see also Davis v. City of Seattle*, No.

10  C06-1659TSZ, 2008 WL 202708, at *11 (W.D. Wash. Jan. 22, 2008) ("The written

11  materials and transcripts speak for themselves."), *aff'd*, 343 F. App'x 230 (9th Cir. 2009).

12      Turning to the purported credibility issues, the Olsons endeavor to identify

13  discrepancies between the call logs produced by Armada's phone company and the

14  numbers purportedly used by Mr. Olson and Ms. Saldana on the two February 2019 calls.

15  (Pls. MSJ Resp. at 8-10.) This argument is difficult to follow from the Olsons' briefing,

16  but what is clear is that they do not explain why this discrepancy suggests a problem with

17  the content of the call transcripts (*see id.*), which the Olsons had an independent

18  opportunity to verify by comparing the transcript to the call recording (*see* Records Not.

19  (Dkt. # 25)). (*See* Pls. MSJ Resp. at 8-10.) For those reasons, this argument is

20  unpersuasive.

21      Finally, the so-called completeness issues that the Olsons identify are likewise

22  unpersuasive. (*Id.* at 10-11.) They note that the transcript does not show certain

1   predicate warnings that Mr. Olson would have received when calling a debt collector, and

2   also omits the brief conversation between Mr. Olson and the Armada representative who

3   transferred his call to Ms. Saldana.  (*Id.*)  Again, the Olsons were given a copy of the

4   transcript of the call and the audio recording.  If they were able to identify material

5   inaccuracies in the transcript, they could have raised those specifically or submitted the

6   recording to the court for its own review.  (Records Not.)  They have done neither and

7   Mr. Olson does not dispute or add to any of the substance of the phone call through his

8   declaration.  (*See* Olson Decl.).  Finally, the purported omissions identified by the Olsons

9   are easily explained by the fact that the transcript plainly documents the call from the

10   point at which Ms. Saldana joined.  (*See, e.g.*, 2/7/19 Call Tr. at 1 ("Emma [Saldana]

11   joins line with Will Olson").)

12         This sort of unsupported "supposition, speculation, and conclusory argument of

13   counsel" does not suffice to create a genuine fact dispute.  *See Brit. Airways Bd.*, 585

14   F.2d at 954.  And because no reasonable jury could find that the events reflected in the

15   call transcript show that Armada engaged in any kind of "false, deceptive, or misleading

16   representation or means," 15 U.S.C. §§ 1692e(10), to collect the debts from the Olsons

17   (*see generally* 2/7/19 Call Tr.; 2/20/19 Call Tr.), the court GRANTS summary judgment

18   in Armada's favor.  *See Anderson*, 477 U.S. at 248.  For the same reasons, the court

19   DENIES summary judgment in the Olsons' favor.

20                    d.      *Mr. Olson's 15 U.S.C. § 1692f Claim*

21         In their final FDCPA claim, the Olsons contend that the conduct underpinning

22   their other FDCPA claims, taken together, also reveals that Armada used "unfair, or

1    unconscionable means to collect the debt" in violation of 15 U.S.C. § 1692f.  (Am.

2    Compl. ¶ 31.)  Because this claim is duplicative of the others discussed above, no specific

3    examination is necessary.  *See, e.g.*, *Marshall v. CBE Grp., Inc.*, No.

4    216CV02406GMNNJK, 2018 WL 1567852, at *9 (D. Nev. Mar. 30, 2018) (granting

5    summary judgment to defendant on plaintiff's § 1692f claim because it did "not allege, or

6    argue, any § 1692f violation that is independent of Plaintiff's [other FDCPA] claim");

7    *Thomas v. Loomis-Therrien*, No. 5:14-CV-00979-CAS, 2014 WL 5335913, at *6 (C.D.

8    Cal. Oct. 20, 2014) (dismissing § 1692f claim where the same allegations were also used

9    to "support plaintiff's claim for violations of other sections of the FDCPA").

10         Accordingly, the court GRANTS summary judgment on this claim to Armada and

11   DENIES it to the Olsons.

12         3.    State Law Claims

13         In addition to the FDCPA claims discussed above, the Olsons also raise state law

14   claims under the WCAA and WCPA.  (*See* Am. Compl. ¶¶ 33-41.)  These claims are

15   entirely coextensive with the FDCPA claims discussed above in two respects:  (1) they

16   rest on the same allegations of misconduct; and (2) the Olsons rely, in part, on

17   establishing liability under the FDCPA to show *per se* violations of the WCAA and

18   WCPA.  (*See id.* ¶ 32.)  The court briefly reviews each claim below.

19              a.    *The Washington Collection Agency Act*

20         The Olsons allege that Armada violated the WCAA (Am. Compl. ¶¶ 32, 41(A)),

21   which makes it a violation to "[t]hreaten to take any action against the debtor which the

22   //

1   licensee cannot legally take at the time the threat is made." RCW 19.16.250(16).[8]  They

2   assert that the "acts and omissions" that comprised their FDCPA claims "also

3   violated . . . the [WCAA]," by which they appear to mean the unfulfilled repayment

4   agreement and Armada's inclusion of Ms. Olson in the state court lawsuit.  (*Compare*

5   Am. Comp. ¶ 32, *with id.* ¶ 41(A).)  The Olsons do not develop or defend this claim

6   further (*see generally* Pls. MSJ Resp.; Pls. MSJ), though it appears to overlap with their

7   claims under 15 U.S.C. §§ 1692e(5) and (10).  As discussed above, the record before the

8   court does not support the Olsons' claim that Armada acted improperly in naming Ms.

9   Olson in the state court lawsuit.  Nor does the evidence permit the court to conclude that

10  Armada breached the terms of any repayment agreement with Mr. Olson.  Because the

11  Olsons' WCAA claim, as far as the court is able to understand it, is based on these same

12  facts, the court GRANTS summary judgment in Armada's favor on this claim.

13          b.      *Washington Consumer Protection Act*

14          The Olsons' final claim alleges that Armada has committed *per se* violations of

15  the WCPA through its violations of the FDCPA and WCAA, along with an independent

16  violation of the WCPA.  (Am. Compl. ¶¶ 40, 41(A), 41(C).)  This claim, like the WCAA

17  claim, is predicated on Armada's "entering a settlement agreement with [Mr. Olson] and

18

_____

19          [8] The Olsons mention RCW 19.16.250(15) at several points in their amended complaint
    and summary judgment filings (*see* Am. Compl. ¶ 40; Pls. MSJ Resp. at 1), but do not discuss
20  that provision in their arguments.  Moreover, they describe their WCAA claim as concerning
    "Armada's threat to take a judgment against [Ms. Olson] for [Mr. Olson's] debt" (Pls. MSJ at 2),
21  which mirrors the language of RCW 19.16.250(16).  The court thus assumes that the references
    to 19.16.250(15) are in error and should be read as 19.16.250(16).  To the extent this assumption
    is incorrect, the claim nevertheless fails for failure to allege or provide evidence of any facts
22  supporting a violation under RCW 19.16.250(15).  (*See generally* Am. Compl.; Pls. MSJ.)

1    then refusing to fulfill its settlement agreement, and in asking for judgment against [Ms.

2    Olson's] separate estate" in the state court action.  (*Id.* ¶ 41(A).)  Because, as discussed

3    above, the court is granting summary judgment in Armada's favor on the FDCPA and

4    WCAA claims, there is no violation of the WCAA that can form the basis of a *per se*

5    WCPA violation.  That leaves only the independent WCPA claim to consider.

6         The WCPA makes unlawful "[u]nfair methods of competition and unfair or

7    deceptive acts or practices in the conduct of any trade or commerce. . . ."  RCW

8    19.86.020.  To prevail under the WCPA, a plaintiff must show that (1) an unfair or

9    deceptive act or practice, (2) occurred in the course of trade or commerce, (3) impacted

10   the public interest, (4) injured the plaintiff's business or property, and (5) was caused by

11   the defendant.  *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719

12   P.2d 531, 533-34 (Wash. 1986).  The court need not engage in extensive analysis as it has

13   already determined that the Olsons have not supplied evidence showing that an unfair or

14   deceptive act or practice occurred.  "Since private CPA plaintiffs must establish all five

15   elements, the finding that the first element is not met is fatal to [the Olsons'] claim.  No

16   other elements need be discussed."  *Id.* at 539.

17        For the reasons set forth above, the court GRANTS summary judgment in

18   Armada's favor and DENIES it to the Olsons.

19                              **2.  CONCLUSION**

20        For the foregoing reasons, the court:  (1) GRANTS Armada's motion for summary

21   judgment (Dkt. # 26); and (2) DENIES the Olsons' motion for partial summary judgment

22   (Dkt. # 38).

ORDER - 23

1    Dated this 22nd day of October, 2021.

2

3

4    _____

5    JAMES L. ROBART
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22